RECEIPT # ................
AMOUNT $ .........
SUMMONS ISSUED ✓
LOCAL RULE 4.1 ..........
WAIVER FORM ..............
MCF ISSUED ..............
BY DPTY. CLK. _Km Aboud_
DATE _2-19-04_

**UNITED STATES DISTRICT COURT FOR THE**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| LOUIS F. MATHESON JR., Derivatively on Behalf of Nominal Defendant, IBIS TECHNOLOGY CORP., | )  )  )  ) |
| Plaintiff, | )  ) |
| v. | )  ) |
| MARTIN J. REID, DIMITRI A. ANTONIADIS, ROBERT L. GABLE, LESLIE B. LEWIS, DONALD McGUINNESS, LAMBERTO RAFFAELLI, and COSMO TRAPANI, | )  )  )  )  )  ) |
| Defendants, | )  )  ) |
| and | )  ) |
| IBIS TECHNOLOGY CORP., | )  ) |
| Nominal Defendant. | )  )  ) |

**CIVIL ACTION NO.**

**SHAREHOLDER DERIVATIVE COMPLAINT**

# 04-10341 RGS

**JURY TRIAL DEMANDED**

MAGISTRATE JUDGE _____

---

Plaintiff, Louis F. Matheson, Jr. ("Matheson" or "Plaintiff") by his attorney submits this Derivative Complaint (the "Complaint") against the Defendants named herein.

## NATURE OF THE ACTION

1.    This is a shareholder's derivative action brought for the benefit of Nominal Defendant, IBIS Technology Corp. ("IBIS" or the "Company") against Defendants Martin J. Reid ("Reid"), Dimitri Antoniadis ("Antoniadis"), Robert L. Gable ("Gable"), Leslie B. Lewis ("Lewis"), Donald McGuinness ("McGuinness"), Lamberto Raffaelli ("Raffaelli"), and Cosmo Trapani ("Trapani") for their breaches of fiduciary duties through intentional misconduct, abdication of their duties of oversight of the Company and/or gross mismanagement.

## JURISDICTION AND VENUE

2.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332(a)(1) in that Plaintiff and Defendants are citizens of different states and the matter in controversy exceeds $75,000, exclusive of interest and costs.

3.     This action is not a collusive one designed to confer jurisdiction on a court of the United States which it would not otherwise have.

4.     Venue is proper in this district because nominal Defendant IBIS' principal place of business is within this district and a substantial portion of the transactions and wrongs complained of herein, occurred within this district.

## PARTIES

5.     Plaintiff, Louis F. Matheson, Jr., a citizen and resident of Washington, is, and was at all relevant times, a shareholder of Nominal Defendant, IBIS.

6.     Defendant, IBIS, is a Massachusetts corporation with its principal place of business located in Danvers, Massachusetts. IBIS manufactures and sells both SIMOX-SOI Oxygen implantation equipment ("the Implanter") and SIMOX-SOI wafers for the worldwide semiconductor industry. The second-generation IBIS Implanter, the i2000 makes the wafers and sells for approximately $8 million. The i2000 Implanter was developed by IBIS, but uses IBM's patented intellectual property. IBM is also IBIS' largest customer for its wafers. For the six months ended June 30, 2003, IBM accounted for $12,140,000 in revenue or 92% of IBIS' total revenues. In that period, IBM purchased one Implanter at a cost of $8 million and virtually all the wafers manufactured by IBIS. IBIS sold no other Implanters in the six months ended June 30, 2003.

7.     Defendant Reid, a citizen and resident of Massachusetts, has been the Chairman of the Company's Board of Directors since May 2000 and has been President

2

and Chief Executive Officer and a Director of the Company since 1997. Defendant Reid authorized the filing of the Company's Amendment No. 3 to the Company's Registration Statement pursuant to SEC Form S-3 dated October 2, 2003 ("Registration Statement") and the Company's Prospectus Supplement to the Registration Statement filed on October 16, 2003 ("Prospectus"). Defendant Reid signed and certified the Company's SEC Form 10-Q for the third quarter of 2003 filed November 4, 2003 ("Q3 10-Q") and was the principal spokesperson for IBIS quoted in the Company's press releases dated October 17, 2003 and October 22, 2003. Reid was a Director of ASAHI America from 1997 to November 1999.

8.    Defendant Antoniadis, a citizen and resident of Massachusetts, has been a Director of the Company since 1996.

9.    Defendant Gable, a citizen and resident of Massachusetts, has been a Director of the Company since 1997. Gable was the Chairman of the Board of Unitrode Corporation from 1990-1998 and its Chief Executive Officer from 1990-1997.

10.    Defendant Lewis, a citizen and resident of Massachusetts, has been a Director of the Company since 1998. Since 1985, Lewis has been President of Asahi America Inc. which merged with Asahi Organic Chemical in December 1999. He has been Chief Executive Officer of Asahi since 1989 and its Chairman since 1996.

11.    Defendant McGuinness, a citizen and resident of Massachusetts, has been a Director of the Company since 1996.

12.    Defendant Raffaelli, a citizen and resident of Massachusetts, has been a Director of the Company since 1998.

13.    Defendant Trapani, a citizen and resident of Massachusetts, has been a Director of the Company since August, 2003. Previously Trapani was Executive Vice

President and CFO of Unitrode Corporation.

14.    The current Board of Directors of IBIS consists of seven (7) members, i.e. Reid, Antoniadis, Gable, Lewis, McGuinness, Raffaelli and Tapani.  As further alleged herein the Board is unable to make an impartial determination as to whether to institute legal proceedings to redress the wrongful conduct alleged herein because there is a substantial likelihood that its members would be found liable for non-exculpated breaches of their fiduciary duties to the Company and shareholders by intentional misconduct and/or completely failing to perform their oversight duties to the Company, failing to oversee the Company's compliance with legally mandated disclosure standards and systemic failure to assure that a reasonable information and reporting system existed.

15.    Each of the Defendants, by virtue of their high-level positions with the Company, was privy to confidential proprietary information concerning the Company and its business, operations, growth, financial statements, and financial condition, as alleged herein.  Such Defendants were involved in drafting, producing, reviewing, approving, disseminating and/or controlling the dissemination of the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal and state securities laws.

16.    Each of the Defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on the Company by disseminating materially false statements and/or concealing material adverse facts or is liable for recklessly permitting the perpetration of such scheme. The scheme deceived the investing public regarding IBIS' business, operations, management and the intrinsic value of IBIS' common stock, causing IBIS' stock to trade at an artificially inflated price, thus adversely

4

affecting the Company's value, exposing the Company to litigation regarding violations of the federal securities laws and compromising the company's ability to secure future business partners and financing.

17.    By reason of their corporate positions and their ability to control the business and corporate affairs of IBIS, at all relevant times, the Defendants owed IBIS and its shareholders fiduciary duties of candor, fidelity, trust and loyalty and were required to use their ability to control IBIS in a fair, just and equitable manner, as well as direct and further the best interests of IBIS and its shareholders. In addition, each Defendant owed IBIS a fiduciary duty to exercise due care and diligence in the management, oversight and administration of the affairs of the Company.

18.    As members of the Board of Directors of IBIS and/or senior executive officers, Defendants were directly responsible for authorizing or permitting the authorization of or failing to monitor, the practices which resulted in the violations of the federal securities laws as alleged herein.

## SUBSTANTIVE ALLEGATIONS

19.    IBIS has built its business on the SIMOX-SOI technology to position itself in the semiconductor market as the company with the leading new technology for the manufacture of wafers. Silicon-on-insulator ("SOI") is a new technique in chip design. Pursuant to its strategy, IBIS developed a SIMOX-SOI implanter for the creation of the SIMOX-SOI wafers. IBIS' newer generation implanter, the i2000, uses and is dependent upon IBM's patented intellectual property. Each i2000 implanter costs approximately $8 million. IBIS also creates and sells the SIMOX-SOI wafers themselves, which are made in different sizes using different production equipment ("product sales"). For the six months ended June 30, 2003, IBIS reported product sales revenues of $4.2 million and equipment

5

revenues of $8.4 million. IBM accounted for 92% of these aggregate revenues.

20.    By the beginning of the Relevant Period, October 2, 2003 through December 12, 2003, Defendants had determined to become the dominant supplier of oxygen implantation to silicon wafer manufacturers so that they could then, using the implanters, create and sell the SOI wafers to their customers. Consequently, as set forth in IBIS' Prospectus at page S-9, Defendants stated that, "[i]n the future we will continue to supply small quantities of wafers for test and evaluation purposes, but our primary emphasis will be on implanter sales and support. We also plan on continuing process development for SIMOX-SOI wafers." Since 2001, IBIS put its principal focus on developing capacity to produce larger size 300 mm wafers, as compared to the 200 mm smaller size wafers. Each size wafer requires a separate production line. The wafer production lines are valued separately and the carrying value of each production line is included in IBIS' financial statements. In order to accomplish its goal of developing capacity to create 300 mm wafers, IBIS had to develop a new generation of implanter, which it called the i2000, to accommodate the larger size 300 mm wafers. IBIS sold only one i2000 implanter before the start of the Relevant Period and that sale was to IBM whose proprietary technology is used in the i2000 implanter. Prior to the development of the i2000 implanter, IBIS had sold two prior generation implanters, known as the 1000 implanter, to IBM in 2000 for approximately $4 million and to Simgui in 2002 for approximately $5 million.

21.    During the Relevant Period, Defendants made a series of materially false and misleading statements and as a result IBIS' common stock traded at artificially inflated prices.

22.    Unbeknownst to the market, IBIS was in a precarious position. The right of

6

IBIS to use IBM's proprietary technology in the development and sale of IBIS' new generation i2000 implanter was the subject of undisclosed ongoing negotiations between IBIS and IBM, which threatened the ability of IBIS to sell the i2000 implanter. Because of IBM's patented technology, sales of the i2000 implanter to a third party required a license from IBM for the use of the technology. Licensing of the technology from IBM was uncertain, particularly since IBIS' potential customers were competitors of IBM.

23.    Typically, a licensing agreement is created and purchasers of the product using patented technology are required to execute the licensing agreement before they can purchase the equipment. IBM itself had not agreed to any licensing agreement that would allow sales to third party purchasers of the i2000 implanter from IBIS before or during the Relevant Period. Consequently, Defendants knew that they could not sell any i2000 implanters to third parties until a licensing agreement was agreed to between IBM and IBIS. Thereafter, any prospective purchasers would be required to agree to the terms and conditions of the licensing agreement. As a result, Defendants' statements to the market that they had received orders for between one and three i2000 implanters from Japanese wafer manufacturers and that the sales would close before December 31, 2003 were false and misleading because of the failure to disclose that a license was required from IBM.

24.    Defendants had no basis for knowing at the time they made their statements whether or when they would reach agreement with IBM on the terms and conditions of a licensing agreement and, then, whether the Japanese manufacturers would agree to the terms and conditions of the licensing agreement with IBM and then actually purchase the i2000 implanter from IBIS.

25.    At the close of the Relevant Period, in a Form 8-K filed with the SEC on December 15, 2003, Defendants admitted that no sales of the i2000 implanter would occur

until sometime in 2004 because, "[t]he exact timing is very difficult to predict because it is dependent on the customer(s) entering into a license agreement with a third party." Although Defendants did not disclose the name of the third party, it is IBM. Defendants further admitted that they no longer even had the orders they said they had in hand. Instead, Defendants stated that they expected to receive an order(s) for one to three i2000 implanters in the first half of 2004 with, according to the Prospectus, actual customer acceptance historically taking "approximately nine months." Only at the end of that period would revenue for the sale be recognized. With this belated disclosure by Defendants of material facts known or recklessly disregarded by them, the market now knew that IBIS' equipment revenues from the sales of i2000 implanters in the fourth quarter of 2003 would be zero, where it had been expecting, based on Defendants' false and misleading statements during the Relevant Period, that IBIS would record revenues of between $8 million and $24 million from the sales of the i2000 implanter in the fourth quarter of 2003, ending December 31, 2003 ("Q4 2003").

26.    Defendants knew, as a result of customer forecasts, orders received to date, inventories, and the shift in the market to 300mm size wafers, that sales of the 200mm and smaller size wafers to IBM, virtually its only customer for the wafer product, would be significantly reduced in Q4 2003. Defendants knew from customer forecasts and as a result of its close working relationship with IBM, that IBM would be greatly reducing its purchases of 200mm and smaller size wafers to approximately only $1 million, down from $2.7 million recorded in Q4 2002 because of reduced demand, orders, sales and bloated inventories. Consequently, Defendants knew that IBIS would be required under GAAP to write down the carrying value of its smaller size wafer production line on IBIS' financial statements. Defendants did not make timely disclosure of these material facts and, instead,

8

affirmatively misrepresented to the market in November 2003 that there was no impairment to the value of the 200 mm and smaller size wafer production line and that there would not likely be any impairment for at least two to three years, if at all.

27.    Rather than make truthful disclosure of IBIS' adverse financial and operating condition, Defendants embarked on a scheme to close IBIS' public offering of common stock at an inflated price and hide from the market and members of the class the material problems facing IBIS.

28.    During the Relevant Period, Defendants issued numerous statements concerning IBIS' business and financial results. These positive representations were materially false and misleading because Defendants failed to disclose and misrepresented the following material adverse facts:

(a)    that demand for IBIS 200 mm and smaller size wafers were in dramatic decline and that its major customer, IBM, who accounted for virtually all of such product revenues, would purchase only approximately $1 million of such product in Q4 2003, compared to $2.7 million in purchases of such product in Q4 2002;

(b)    that because of the facts alleged in subparagraph (a) above and the reduction in demand in the marketplace for the 200 mm and smaller size wafers, as alleged above, IBIS would be required under GAAP to write down in a material amount the value of the 200 mm and smaller size wafer production line it carried on its financial statements;

(c)    that IBIS had not agreed upon the terms and conditions of a licensing agreement with IBM with respect to IBM's patented technology used by IBIS in the manufacture of the i2000 implanter, and upon which the i2000 was dependent, that IBIS was involved in negotiations with IBM and that Defendants were not in any position to know if and when it and IBM would agree to the terms and conditions of a licensing

9

agreement;

(d)    that until IBIS and IBM had agreed upon the terms and conditions of a licensing agreement and any potential purchaser of the i2000 implanter agreed with IBM to the terms of the licensing agreement, Defendants were not able to close on the sale of its i2000 implanter to any purchaser other than IBM, which had not ordered any additional i2000 implanters;

(e)    that Defendants lacked any reasonable basis for their statements to the market that the orders IBIS had received for one to three i2000 implanters from Japanese wafer manufacturers would close by December 31, 2003, in light of the facts alleged in subparagraphs (c) and (d) herein. In addition, Defendants knew that there was a substantial probability that those orders would be withdrawn pending the Japanese purchasers' decisions whether and when to agree to the terms of the licensing agreement that IBIS might enter into with IBM; and

(f)    that as a result of the foregoing, Defendants lacked a reasonable basis for their statements made during the Relevant Period concerning the Company's prospects, earnings and value, as alleged hereinafter.

29.    Defendants were motivated to conceal and delay disclosure of the adverse material facts detailed herein in order to maintain and inflate the price of IBIS common

stock so that the Company could close on an offering of its common stock in October 2003 in order to generate desperately needed funds for operations. With working capital of only $3.785 million at June 30, 2003, its lowest point in three years, IBIS' planned stock offering was for 1 million shares and was to raise net proceeds of approximately $11 million.

      30.    During the Relevant Period, Defendants made the following misrepresentations of material fact. On October 2, 2003 IBIS filed the Registration Statement for the upcoming public offering of its common stock and on October 16, 2003 Defendants filed the Prospectus for the stock offering. The Registration Statement was signed by each of the Defendants. Nowhere in these SEC-filed documents did Defendants disclose the material adverse facts alleged above. To the contrary, Defendants portrayed IBIS in a misleading light and misrepresented the known and available facts in, inter alia, the risk disclosure sections of the Registration Statement and Prospectus where defendants discussed numerous "risks" associated with IBIS and technology, products, customer base, patents and proprietary technology, and quarterly earnings.

      (a)    Defendants misrepresented and did not disclose the existing material facts that IBIS would not be able to sell the i2000 implanter to any third party until IBIS had resolved the existing patent issues with IBM, that IBIS and IBM had not come to agreement on the terms and conditions of a licensing agreement that would have to be entered into by the purchaser of the i2000 implanter from IBIS and that it was probable that IBIS would not be able to close on the sales of the i2000 implanter ordered by Japanese wafer manufacturers that Defendants told the market to expect would be closed by December 31, 2003;

(b)    Defendants misrepresented and did not disclose the existing material fact that because demand for 200 mm and smaller size wafers was down, which Defendants knew as the result, inter alia, of customer forecasts, and IBM was purchasing those wafers in greatly reduced amounts in Q4 2003, beginning October 1, 2003 (more than two weeks before the offering commenced), that IBIS' revenues for Q4 2003 would be significantly reduced and reduced further by the fact that the 200mm and smaller size wafer production line IBIS carried on its financial statements was materially impaired and would have to be written down by December 31, 2003.

(c)    Defendants misrepresented and did not disclose, in the discussion of IBM as a significant customer, the existing material facts of the patent issue as alleged hereinbefore, including the material facts that no licensing agreement permitting IBIS to sell the i2000 implanter to third parties had been agreed to, that the negotiations of the terms and conditions of the licensing agreement were ongoing, and that the Japanese wafer manufacturers that had placed order(s) for the i2000 implanter had not seen the licensing agreement that they would be required to execute with IBM before they could complete their purchases from IBIS because the licensing agreement did not yet exist.

31.    On October 17, 2003, with IBIS' common stock price artificially inflated to over $14 per share, Defendants issued a press release announcing the public offering of 1 million shares of IBIS common stock, and on October 21, 2003, IBIS issued another press release announcing that the stock offering had closed and that IBIS netted proceeds of approximately $12.7 million.

32.    On October 22, 2003, Defendants issued a press release announcing IBIS' results for the third quarter of 2003, the three months ended September 30, 2003. IBIS described itself

as the leading provider of SIMOX-SOI implantation equipment and wafers to the semiconductor industry and reported the sale of one i2000 implanter for approximately $8 million. Defendant Reid was quoted in the press release:

> We are very pleased to announce another quarter of record wafer sales... Wafer sales for the third quarter were $3.7 million, up from the previous quarter's $3.5 million. Most of the wafers shipped were 300mm wafers....and we are now shipping wafers produced using the newest SIMOX-SOI process that was developed under the auspices of a joint development agreement with our largest customer.

> We are also pleased with the progress being made on the equipment side of our business. Significant improvements and upgrades have been made in our i2000 implanter in recent months.... As a result, both throughput and wafer quality are improved, further strengthening the position of SIMOX-SOI as the economical SOI solution.

In addition, Defendant Reid commented on the Company's outlook, stating that:

> Although we anticipate a fourth quarter slowdown for 300mm wafer business at our largest customer, forecasts from this customer and others for 2004 continue to look positive. During the fourth quarter our priority on the wafer side of the business will be to broaden our customer base in both 300 mm and 200mm by sampling our latest IMOX-SOI wafers. We are currently undergoing 200 mm evaluation at two customers and positive results should translate to orders in early 2004. Forecasting future wafer sales, on a quarter-by-quarter basis, remains exceedingly difficult, and significant variations, quarter to quarter, are likely. We also continue to anticipate booking orders for one-to-three implanters during the fiscal year.

33.    The statements quoted above from the October 22, 2003 press release were false and misleading because they failed to disclose the material facts alleged above, and were materially false and misleading because they failed to disclose and misrepresented the following material adverse facts, among others:

(a)     that IBM had reduced its orders for and purchases of 200 mm and smaller size wafers from $2.7 million in Q4 2002 to approximately $1 million in Q4 2003; and

(b)     that the Company had no reasonable expectation that it would be able to close on –or "book"- the orders for i2000 implanters from Japanese wafer manufacturers in fiscal 2003 because of the patent issues with IBM, including the lack of any agreement on the terms and conditions of a licensing agreement with IBM which purchasers of the i2000 implanter would be required to enter into as a prerequisite to purchasing an i2000 implanter from IBIS;

(c)     that the carrying value of IBIS' 200 mm and smaller size wafer production line was materially impaired and that IBIS would be required to take a material charge to earnings in Q4 2003; and

(d)     that as a result of the foregoing, Defendants lacked a reasonable basis for their statements concerning the Company's prospects, earnings and value.

34.     On November 4, 2003, Defendants filed IBIS' Q3 10-Q.  The Q3 10-Q was signed by Defendant Reid.  Statements made in the Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD & A"), including the following, were false and misleading:

> In 2002, we introduced the next generation of SIMOX-SOI technology which included our second-generation oxygen implanter (i2000)....licensed to Ibis by IBM.

> \*\*\*

> Although our 200mm and smaller wafer size production line is currently underutilized, considering our future plans, current potential business prospects and alternatives, Management believes that we do not have an impairment issue at this time. However, if our future current process cycle (which typically lasts two or three years) or our customer transition to the 300 mm wafer size [happens] sooner than we anticipate, our 200 mm and smaller wafer size production line may become obsolete and we would be required to reduce our income by an impairment loss which would be

14

material.

These statements were false and misleading because they failed to disclose the material facts alleged above, and were materially false and misleading because they failed to disclose and misrepresented the following material adverse facts, among others.

(a)    that IBM had reduced its orders and purchases for 200 mm and smaller size wafers from $2.7 million in Q4 2002 to approximately $1 million in Q4 2003; and

(b)    that the Company had no reasonable expectation that it would be able to close on — or "book" — the orders for implanters from Japanese wafer manufacturers in fiscal 2003 because of the patent issues with IBM, lack of any licensing agreement and the state of the ongoing negotiations;

(c)    that the carrying value of IBIS' 200 mm and smaller size wafer production line was materially impaired and that IBIS would be required to take a material charge to earnings in Q4 2003; and

(d)    that as a result of the foregoing, Defendants lacked a reasonable basis for their statements concerning the Company's prospects, earnings and value.

## THE TRUTH EMERGES

35.    On December 15, 2003, Defendants disclosed that IBIS' fourth quarter wafer product revenues would be reduced to approximately $1 million, down from $2.7 million in the prior year's fourth quarter, due to reduced purchases by its largest customer (although Defendants did not name the customer it is IBM) and that IBIS would be taking a "material charge" due to the impairment of its smaller size wafer production equipment as IBIS was increasing its emphasis on the production of large wafers as the result, in part,

15

of its customer forecasts. In reaction to the announcement, the price of IBIS' common stock fell from a $15.40 per share at close on December 12, 2003 to a close of $13.20 per share on December 15, 2003 and a closing price of $10.37 on December 16, 2003, on extraordinary high combined volume of 4.4 million shares, almost 50% of the outstanding shares of IBIS common stock.

36.    As alleged herein, Defendants knew that the public statements or documents issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public, and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements as primary violations of the federal securities laws. Defendants, by virtue of their receipt of information reflecting the true facts regarding IBIS, IBM, its largest customer and owner of the patented technology involved in the i2000 implanter, and the Japanese wafer manufacturers who ordered implanters, were privy to the material facts alleged herein to have been omitted and misrepresented by Defendants in their public statements, alleged herein above.

37.    Defendants were motivated to commit the fraud alleged herein so that the Company could complete the October common stock offering, which was critically important to IBIS because it needed working capital, and, at the same time, not scare off potential purchasers of the implanter while Defendants desperately tried to negotiate with IBM concerning the patent issues involved in IBIS' efforts to sell the implanter. Defendant Reid, because of the public common stock offering, was not able to sell his personal shares of IBIS during the Relevant Period.

38.    Throughout the relevant period, the Defendants disseminated and/or approved the false statements specified above, which they knew were misleading in that they contained

16

misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading. Furthermore, the Defendants, Directors of the Company, failed to discharge their responsibilities of oversight of the Company's affairs. Because of the actions described herein, securities class actions have been filed against the Company which have had the effect of impairing the Company's credibility in the market place and elsewhere. The Defendants' malfeasance and/or misfeasance has exposed the Company to millions of dollars in liability to investors in class action lawsuits which have been filed against the Company as well as current investigatory and litigation expenses which will continue into the future.

39.    The Company should not have to bear the enormous financial burdens caused by the actions of the Defendants who breached their fiduciary duties owed to IBIS by issuing false and misleading statements for the Company and/or permitting same and completely failing to discharge their oversight responsibilities.

## DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

40.    Plaintiff brings this action derivatively in the right and for the benefit of IBIS to redress injuries suffered and to be suffered by IBIS as a result of the breaches of fiduciary duty by the Defendants. This is not a collusive action to confer jurisdiction on this Court which it would not otherwise have.

41.    Plaintiff will adequately and fairly represent the interests of IBIS and its shareholders in enforcing and prosecuting its rights.

42.    Plaintiff is an owner of IBIS common stock and was an owner of IBIS common stock at all times relevant to the Defendants' wrongful course of conduct alleged herein through the present.

17

43.    As a result of the facts set forth herein, Plaintiff has not made any demand on IBIS' Board of Directors to institute this action against the Defendants. Such demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action for the following reasons:

(a)    Each of the Defendants exhibited a sustained and systemic failure to fulfill their fiduciary duties, which could not have been an exercise of good faith business judgment and amounted to gross negligence and extreme recklessness;

(b)    The Defendants had a responsibility and obligation to assure that all press releases and filings of SEC reports were accurate and that all controls and oversight procedures were in place that would have detected and prevented the false and misleading statements put out by the Company to the public that are described in this Complaint;

(c)    In order to bring this suit, the Defendants would be forced to sue themselves which they will not do, thereby excusing demand;

(d)    IBIS has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein; yet, the Defendants have not filed any lawsuits against themselves or other individuals who were responsible for the wrongful conduct which caused the filing of securities class actions against IBIS, nor have they attempted to recover from the responsible persons any part of the damages IBIS suffered and will suffer thereby;

(e)    If the Defendants were to bring this derivative action against themselves, they would thereby further expose their own negligence and misconduct which underlies allegations against the Company contained in the class action complaints for violations of federal securities law. Such admissions would impair the Company's and their defense of the Class Actions and greatly increase the probability of their personal liability in the Class Actions, in an amount likely to be in excess of any insurance coverage available to the Defendants; and

(f)    Because of longstanding business, financial, personal and/or social relationships with each other, a majority of the Company's directors lack the independence necessary to make an objective determination of whether to institute a lawsuit against the other Defendant officer and directors.

44.    Plaintiff has not made any demand on the shareholders of IBIS to institute this action since demand would be a futile and useless act for the following reasons:

    (a)    IBIS is a publicly traded company with thousands of shareholders;

    (b)    Making demand on such a number of shareholders would be impossible for Plaintiff, who has no way of finding out the names, addresses, or telephone numbers of shareholders; and

    (c)    Making demand on all shareholders would force Plaintiff to incur huge expenses assuming all shareholders could even be individually identified.

45.    IBIS has expended and will continue to expend significant sums of money as a result of the illegal and improper actions described above. Such expenditures will include, but are not limited to:

    (a)    Costs incurred to carry out internal investigations, including legal fees paid to outside counsel and experts; and

    (b)    Costs and legal fees for defending IBIS and the Defendants against private class action litigation arising from the illegal and improper conduct alleged herein.

46.    In addition, IBIS and its shareholders will continue to be damaged by the tarnishment of the Company's reputation and the impairment of its ability to obtain capital through credit and equity markets.

## COUNT I

## DERIVATIVE CLAIM AGAINST ALL DEFENDANTS FOR
## BREACH OF FIDUCIARY DUTY

47.    Plaintiff incorporates by reference and realleges each of the foregoing allegations, as though fully set forth herein.

48.    The Defendants breached their fiduciary duties to the Company and its shareholders by failing in their oversight responsibility and by making and/or permitting material

false and misleading statements to be made concerning the Company's business prospects and financial condition, which artificially inflated the value of the Company's common stock and resulted in numerous class action lawsuits against the Company and impaired the Company's ability to secure needed capital.

49.    The Defendants owe a fiduciary duty to IBIS to supervise the issuance of its press releases and public filings to ensure that they are truthful and accurate and that they conform with federal and state securities law. The Defendants breached their fiduciary duties by failing to properly exercise their oversight responsibilities by allowing misleading statements and filings to be issued and made.

50.    The Defendants have engaged, knowingly or recklessly, in a sustained and systemic failure to exercise their oversight responsibilities to ensure that IBIS complied with federal and state laws and to ensure the integrity of its financial reporting.

51.    The Form 10-Q and Registration Statement filed by IBIS with the SEC and containing false and misleading financial information were each signed by certain of the Defendants as alleged herein. Each of these Defendants, therefore, had a heightened responsibility to ensure the integrity of these public filings.

52.    As high ranking officers and/or members of the Board of Directors of IBIS, the Defendants were directly responsible for authorizing or permitting the authorization of, or failing to monitor, the practices which resulted in violation of the federal securities laws as alleged herein. Each of them had knowledge of and actively participated in and approved of the wrongdoings alleged or abdicated his/her responsibilities with respect to these wrongdoings. The alleged acts of wrongdoing subjected IBIS to unreasonable risks.

53.    Each of the Defendants' acts in causing or permitting the Company to disseminate

to the investing public and the Company's shareholders material misrepresentations and omissions concerning IBIS' revenues, income, and business prospects has subjected the Company to liability for violation of federal and state laws, and therefore was not the product of a valid exercise of business judgment and was a complete abdication of their duties as officers and directors of the Company. As a result of the Defendants' breaches, IBIS is the subject of major securities fraud class action lawsuits by defrauded investors, has had its reputation in the business community irreparably tarnished, and has thus been damaged.

**COUNT II**

**CONTRIBUTION AND INDEMNIFICATION**

54.    Plaintiff repeats and realleges each and every allegation set forth above.

55.    IBIS is alleged to be liable to various persons, entities and/or classes by virtue of the same facts or circumstances as are alleged herein to give rise to Defendants' liability to IBIS.

56.    IBIS' alleged liability on account of the wrongful acts and practices and related misconduct described above arises, in whole or in part, from the knowing, reckless, disloyal and/or bad faith acts or omissions of the Defendants as alleged above, and IBIS is entitled to contribution and indemnification from each of the Defendants in connection with all such claims that have been, are or may in the future be asserted against IBIS by virtue of the Defendants' misconduct.

**WHEREFORE**, Plaintiff demands judgment as follows:

A.    Directing the Defendants to account to the Company for all damages sustained or to be sustained by the Company by reason of the wrongs alleged herein;

B.    Directing the Defendants to pay interest at the highest rate allowable by law on the amount of damages sustained by the Company as a result of Defendants' culpable conduct;

21

C.    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees and expenses; and

D.    Granting such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

Dated: February /8, 2004

Alan L. Kovacs (BBO No. 278240)
**LAW OFFICE OF ALAN L. KOVACS**
2001 Beacon Street, Suite 106
Boston, MA 02135
Phone: (617) 964-1177
Fax: (617) 332-1223


William B. Federman
FEDERMAN & SHERWOOD
120 N. Robinson, Suite 2720
Oklahoma City, OK 73102
Phone: (405) 235-1560
Fax: (405) 239-2112


Marc S. Henzel
LAW OFFICES OF MARC S. HENZEL
273 Montgomery Avenue, Suite 202
Bala Cynwyd, PA 19004
Telephone: (610) 660-8000
Fax: (610) 660-8080


Brian M. Felgoise
LAW OFFICE OF BRIAN M. FELGOISE
261 Old York Road, Suite 423
Jenkintown, PA 19046
Telephone: (215) 886-1900
Fax: (215) 886-1909

## VERIFICATION

I, Louis F. Matheson, Jr., declare that I have reviewed the Derivative Complaint ("Complaint") prepared on behalf of IBIS Technology Corporation and I authorize its filing. I have reviewed the allegations made in the Complaint, and to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and for that reason believe them to be true. I further declare that I am a current holder, and have been a holder, of IBIS Technology Corporation common stock during the time in which the wrongful conduct alleged and complained of in the Complaint was occurring.

Louis F. Matheson, Jr.